UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF CONNECTICUT

----------------------------------------------------- x
                                                      :
RAYMOND FRANCIS CLARK, JR.        :            3:18 CV 1903 (RMS)
                                                      :
V.                                                   :
                                                      :
ANDREW SAUL,                            :
COMMISSIONER                        :
OF SOCIAL SECURITY[1]              :            DATE: SEPT. 20, 2019
                                                      :
----------------------------------------------------- x

RULING ON THE PLAINTIFF'S MOTION TO REVERSE THE DECISION OF THE
COMMISSIONER, OR IN THE ALTERNATIVE, MOTION FOR REMAND FOR A
HEARING, AND ON THE DEFENDANT'S MOTION FOR AN ORDER AFFIRMING THE
DECISION OF THE COMMISSIONER

This action, filed under § 205(g) of the Social Security Act, 42 U.S.C. § 405(g), seeks

review of a final decision by the Commissioner of Social Security ["SSA"] denying the plaintiff

disability insurance benefits ["SSDI"].

I.      ADMINISTRATIVE PROCEEDINGS

On July 31, 2015, the plaintiff filed an application for SSDI, claiming that he has been

disabled since March 31, 2006,[2] due to a double hip replacement, diabetes, celiac disease, iron

deficiency, chronic gout, psoriatic arthritis, monoclonal gammopathy, stage 3 chronic kidney

disease, osteoarthritis, osteopenia, high blood pressure, and high cholesterol. (*See* Doc. No. 9,

---

[1] The plaintiff commenced this action against Nancy A. Berryhill, as Acting Commissioner of Social Security. (Doc. No. 1). On June 17, 2019, Andrew M. Saul became the Commissioner of Social Security. Because Nancy A. Berryhill was sued in this action only in her official capacity, Andrew M. Saul is automatically substituted for Nancy A. Berryhill as the named defendant. *See* FED. R. CIV. 25(d). The Clerk of the Court shall amend the caption in this case as indicated above.

[2] Just prior to his hearing, the plaintiff amended his onset date of disability to March 1, 2012. (Tr. 301; *see* Tr. 43). Because his date last insured was June 30, 2012, the relevant period at issue in this case is March 1, 2012 through June 30, 2012. *See* 42 U.S.C. § 423(c); 42 U.S.C. § 423(d)(1)(A); 20. C.F.R. § 404.1509 (an impairment must start before your date last insured and be expected to last for a continuous period of at least 12 months.)

Certified Transcript of Administrative Proceedings, dated December 21, 2018 ["Tr."] 103). The plaintiff's applications were denied initially and upon reconsideration (Tr. 127-30, 136-43), and on October 24, 2017, a hearing was held before Administrative Law Judge ["ALJ"] John Aletta, at which the plaintiff and a vocational expert testified. (Tr. 34-57). On November 16, 2017, the ALJ issued an unfavorable decision denying the plaintiff's claim for benefits (Tr. 12-29). On September 18, 2018, the Appeals Council denied the request, thereby rendering the ALJ's decision the final decision of the Commissioner. (Tr. 1-5).

On November 21, 2018, the plaintiff filed his complaint in this pending action (Doc. No. 1), and on November 27, 2018, the parties consented to the jurisdiction of a United States Magistrate Judge. (Doc. No. 7). This case was transferred accordingly. On March 21, 2019, the plaintiff filed his Motion to Reverse the Decision of the Commissioner (Doc. No. 11), with a brief (Doc. No. 11-2 ["Pl.'s Mem."]), exhibits (Doc. Nos. 11-3, 11-4, 11-5, 11-6), and Statement of Material Facts (Doc. No. 11-1) in support. On May 13, 2019, the defendant filed his Motion to Affirm (Doc. No. 12 ["Def.'s Mem."]), with a Statement of Material Facts in support (Doc. No. 12-1).

For the reasons stated below, the plaintiff's Motion to Reverse the Decision of the Commissioner (Doc. No. 11) is GRANTED, and the defendant's Motion to Affirm (Doc. No. 12) is DENIED.

II.     FACTUAL BACKGROUND

On the date of the hearing, the plaintiff was sixty-three years old (Tr. 41), and during the relevant period at issue in 2012, he lived with his wife in a two-level home. (Tr. 45, 63). He would use a snow blower, as necessary, and mowed the lawn on a riding lawn mower. (Tr. 63). He could not dress himself without his wife's assistance because of his multiple hand surgeries, but

he could make the bed.  (Tr. 63-64).  He completed high school and trained for a year to be a respiratory therapist.  (Tr. 44).  He had a Class B driving license, but "[t]hey took it away from [him] because of diabetes."  (Tr. 44).

From 2002 to 2006, the plaintiff worked for CWPM, LLC, a trash hauling company, supervising the sales department and performing some sales work.  (Tr. 46-47).  From 2012 to 2014, the plaintiff "was trying" to sell residential real estate.  (Tr. 48-49).  He would research properties on-line and would use the internet with one hand because he could not use his left hand at that time.  (Tr. 66).  He stopped the real estate work because it cost him a lot of money in annual licensing fees, and there were several other associated costs.  (Tr. 68-69).

The plaintiff testified that he could not work from March 1, 2012 to June 30, 2012 because he was "having significant pain[]" in his neck, shoulders, right arm, and lower back, and his ankles and feet were "giving [him] a lot of problems."  (Tr. 50). The plaintiff explained that he injured his left hand in June 2010 when he grabbed his gas grill to keep it from falling over, and as "it fell backwards[,] it stripped all of the skin to the end of [his] fingers. It took – they cut all the nerves, ligaments."  (Tr. 52).  He had three surgeries on that hand as a result of this injury.  (Tr. 52).  The plaintiff testified also that he had surgeries on both feet, a laminectomy on his lower back, and he was seeing a rheumatologist.  (Tr. 52). He explained that he had psoriatic arthritis, which included pain in his joints, and he had "a hard time with . . . [his] ankles[.]" (Tr. 70-71). He had chronic edema in his feet and ankles, and he would use compression socks. (Tr. 73).  At the time of the hearing, he was insulin dependent, and he had diabetic neuropathy.  (Tr. 72).  He had gained about forty pounds from taking Prednisone. (Tr. 74-75).

Between March and June 2012, the plaintiff had "terrible pain" in his right shoulder, that radiated down his arm.  (Tr. 79).  He could not lift overhead and had "problems" putting on his

jacket. (Tr. 79). Moreover, according to the plaintiff, during the relevant time, he could not carry anything, he had trouble sleeping because of pain when he turned, and he had pain bending, stooping, kneeling and crouching. (Tr. 59). Additionally, at that time, he had arthritis in his right hand, and the surgeries on his left hand helped "as much as [they] possibly could[,]" but he still did not have any feeling in the tips of three of his fingers, and he "ended up with carpal tunnel because of the fingers too." (Tr. 61-62). He described his typical day as moving around within the house, trying to do some work, and then napping or resting. (Tr. 75-76). He could sit for a "few hours[.]" (Tr. 77). He received regular physical therapy following his surgeries. (Tr. 76). He used a TENS[3] machine on his back, as well as hot packs and cold packs. (Tr. 78).

Additionally, the intake interview notes from the plaintiff's application for benefits stated as follows:

> Claimant was in significant discomfort/pain during the interview. . . . His left hand was markedly stiff/immobil[e], he could not make a fist and it had the appearance of a prosthetic because it was so pale/stiff in comparison to [the] right hand. [C]laimant spoke very proudly of working hard his entire life and struggled to have to file for disability. [O]n [three] separate occasions during [the] [two]-hour long interview, claimant needed to take a break and stand, take a couple of very stiff/painful steps, then return to [his] seat.

(Tr. 230).

A vocational expert testified that the plaintiff's past work as a sales manager and real estate agent were performed at the sedentary level, and could be performed by a person who could occasionally reach overhead with the right dominant arm, occasionally handle items with the left non-dominant hand, frequently climb ramps and stairs, and could frequently balance, kneel, and crouch, occasionally climb ladders, ropes or scaffolds, and occasionally crawl. (Tr. 83-84). If such a person was limited further by occasionally fingering items with the left non-dominant

---

[3] A TENS (transcutaneous electrical nerve stimulation) unit is a battery-operated device that uses low voltage electric current to relieve back pain. https://www.webmd.com/back-pain/guide/tens-for-back-pain (last visited Sept. 5, 2019).

hand, that person would still be able to perform the work of a sales manager, but the number of jobs would be reduced. (Tr. 84). The vocational expert testified that the limitations on handling and fingering would eliminate "a lot of medium jobs[,]" but such a person could perform light work as a security guard, usher, and parking lot attendant. (Tr. 86).

III.    THE ALJ'S DECISION

Following the five-step evaluation process,[4] the ALJ found that the plaintiff last met the insured status requirements through June 30, 2012 (Tr. 17), and that the plaintiff did not engage in substantial gainful activity during the amended alleged onset date of March 1, 2012 through his date last insured of June 30, 2012. (Tr. 17, citing 20 C.F.R. § 404.1571 *et seq.*).

At step two, the ALJ found that, through his date last insured, the plaintiff had the following severe impairments: degenerative disc disease of the lumbar spine, post-laminectomy syndrome, degenerative disc disease of the cervical spine, status post cervical spine discectomy, osteoarthritis of the right shoulder, penritendonitis of the right shoulder, adhesive capsulitis of the right shoulder, stenosing tensovitis of the little finger of the left hand, and status post flexor tendon injuries of the left fingers. (Tr. 18-19, citing 20 C.F.R. § 404.1520(c)). The ALJ concluded at step three that the

---

[4] First, the ALJ must determine whether the claimant is currently working. *See* 20 C.F.R. § 404.1520(a)(4)(i). If the claimant is currently employed, the claim is denied. *Id.* If the claimant is not working, as a second step, the ALJ must make a finding as to the existence of a severe mental or physical impairment; if none exists, the claim is also denied. *See* 20 C.F.R. § 404.1520(a)(4)(ii). If the claimant is found to have a severe impairment, the third step is to compare the claimant's impairment with those in Appendix 1 of the Regulations [the "Listings"]. *See* 20 C.F.R. § 404.1520(a)(4)(iii); *Bowen v. Yuckert*, 482 U.S. 137, 141 (1987); *Balsamo v. Chater*, 142 F.3d 75, 79–80 (2d Cir. 1998). If the claimant's impairment meets or equals one of the impairments in the Listings, the claimant is automatically considered disabled. *See* 20 C.F.R. § 404.1520(a)(4)(iii); *see also Balsamo*, 142 F.3d at 80. If the claimant's impairment does not meet or equal one of the listed impairments, as a fourth step, he will have to show that he cannot perform his former work. *See* 20 C.F.R. § 404.1520(a)(4)(iv). If the claimant shows he cannot perform his former work, the burden shifts to the Commissioner to show that the claimant can perform other gainful work. *See Balsamo*, 142 F.3d at 80 (citations omitted). Accordingly, a claimant is entitled to receive disability benefits only if he shows he cannot perform his former employment, and the Commissioner fails to show that the claimant can perform alternate gainful employment. *See* 20 C.F.R. § 404.1520(a)(4)(v); *see also Balsamo*, 142 F.3d at 80 (citations omitted).

plaintiff did not have an impairment or combination of impairments that met or medically equaled the severity of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1. (Tr. 19-20, citing 20 C.F.R. §§ 404.1520(d), 404.1525 and 404.1526). Specifically, the ALJ concluded that the claimant's physical impairments did not meet or medically equal Listings 1.02 (major dysfunction of a joint), 1.04 (disorders of the spine) and 11.14 (peripheral neuropathy).

The ALJ concluded that the plaintiff had the residual functional capacity ["RFC"] to perform light work, as defined in 20 C.F.R. § 404.1567(b), except he could occasionally reach overhead with his right dominant arm and could occasionally handle, feel and finger items with his left non-dominant hand. (Tr. 21). Additionally, he could frequently climb ramps and stairs, and occasionally climb ladders, ropes and scaffolds; he could frequently balance, kneel, and crouch, and occasionally crawl; and, he could not work at unprotected heights. (Tr. 21). At step four, the ALJ concluded that, through his date last insured, the plaintiff could perform his past relevant work as a sales manager, as that work did not require the performance of work-related activities precluded by the claimant's RFC. (Tr. 27-28, citing 20 C.F.R. § 404.1565). In the alternative, the ALJ concluded that the plaintiff "acquired work skills from past relevant work that were transferable to other occupations with jobs existing in significant numbers in the national economy." (Tr. 28, citing 20 C.F.R. §§ 404.1569, 404.1569(a) and 404.1568(d)). The ALJ considered the vocational expert's testimony that a person of the profile of this plaintiff could have performed the work of an office manager and employment interviewer, with very little, if any, vocational adjustment. (Tr. 28-29). Accordingly, the ALJ concluded that the plaintiff was not under a disability at any time from March 1, 2012, the amended alleged onset date, through June 30, 2012, the date last insured. (Tr. 29, citing 20 C.F.R. § 404.1520(f)).

IV.     STANDARD OF REVIEW

The scope of review of a Social Security disability determination involves two levels of inquiry. First, the court must decide whether the Commissioner applied the correct legal principles in making the determination. Second, the court must decide whether the determination is supported by substantial evidence. *See Balsamo v. Chater*, 142 F.3d 75, 79 (2d Cir. 1998) (citation omitted). The court may "set aside the Commissioner's determination that a claimant is not disabled only if the factual findings are not supported by substantial evidence or if the decision is based on legal error." *Burgess v. Astrue*, 537 F.3d 117, 127 (2d Cir. 2008) (citation & internal quotation marks omitted); *see also* 42 U.S.C. § 405(g). Substantial evidence is evidence that a reasonable mind would accept as adequate to support a conclusion; it is more than a "mere scintilla." *Richardson v. Perales*, 402 U.S. 389, 401 (1971) (citation omitted); *see Yancey v. Apfel*, 145 F.3d 106, 111 (2d Cir. 1998) (citation omitted). "The substantial evidence rule also applies to inferences and conclusions that are drawn from findings of fact." *Gonzalez v. Apfel*, 23 F. Supp. 2d 179, 189 (D. Conn. 1998) (citing *Rodriguez v. Califano*, 431 F. Supp. 421, 423 (S.D.N.Y. 1977)). However, the court may not decide facts, reweigh evidence, or substitute its judgment for that of the Commissioner. *See Dotson v. Shalala*, 1 F.3d 571, 577 (7th Cir. 1993) (citation omitted). Instead, the court must scrutinize the entire record to determine the reasonableness of the ALJ's factual findings. *See id.* Furthermore, the Commissioner's findings are conclusive if supported by substantial evidence and should be upheld even in those cases where the reviewing court might have found otherwise. *See* 42 U.S.C. § 405(g); *see also Beauvoir v. Chater*, 104 F.3d 1432, 1433 (2d Cir. 1997) (citation omitted); *Eastman v. Barnhart*, 241 F. Supp. 2d 160, 168 (D. Conn. 2003).

V.    DISCUSSION

The plaintiff argues that the administrative record was not developed in that there is no medical source statement from Dr. David P. Grise, Jr., the plaintiff's treating physician, Dr. Daniel J. Mastella, who treated the plaintiff's left hand injury, Dr. John J. Mara, who treated the plaintiff's right shoulder impairment, or Dr. Stephan C. Lange, who treated the plaintiff's radiating neck pain and his cervical spine impairment. (Pl.'s Mem. at 2-3). Accordingly, the plaintiff argues that the ALJ failed to develop the record. (Pl.'s Mem. at 3). Additionally, the plaintiff contends that the ALJ erred in assigning "little weight" to the one medical source statement in the record, a statement from APRN Nanette Alexander. (Pl.'s Mem. at 4).

On appeal, this court must "conduct a plenary review of the administrative record to determine if there is substantial evidence, considering the record as a whole, to support the Commissioner's decision and if the correct legal standards have been applied." *See Moran v. Astrue*, 569 F.3d 108, 112 (2d Cir. 2009) (citation & internal quotations omitted). The issue of whether an ALJ has satisfied his obligation to develop the record is one that "must be addressed as a threshold issue." *Downes v. Colvin*, No. 14 CV 7147(JLC), 2015 WL 4481088, at *12 (S.D.N.Y. July 22, 2015). Upon a thorough review of the administrative record, the Court concludes that the ALJ failed to adequately develop the record by ignoring relevant treatment records and not requesting a treating physician opinion as to the plaintiff's functional limitations during the time period at issue. *See Rosa v. Callahan*, 168 F.3d 72, 80 (2d Cir. 1999) (holding that an ALJ's failure to "fulfill his affirmative obligation to develop the administrative record" constitutes legal error).

A.    <u>DUTY TO DEVELOP THE RECORD</u>

The time period at issue in this case is limited to a four-month span from March to June 2012, during which the plaintiff was under the care of several physicians, none of whom provided a function-by-function assessment of the plaintiff.  Of these several treating physicians during this relevant period, the ALJ only references in his decision Dr. Lange's treatment notes from April 12, June 13 and October 10, 2012.  (Tr. 21-27).  He fails even to refer to the records of the other providers from the relevant months.  (Tr. 21-27). The ALJ's approach to this case runs contrary to the well-settled premise that a "hearing on disability benefits is a non-adversarial proceeding," and as such, "the ALJ generally has an affirmative obligation to develop the administrative record." *Perez v. Chater*, 77 F.3d 41, 47 (2d Cir. 1996) (citation omitted).   This duty exists even when, as in this case, the claimant is represented by counsel.  *Id.* (citation omitted); *see also Burgess*, 537 F. 3d at 128.  When asked at the close of his administrative hearing whether plaintiff's counsel had additional evidence to present, he "point[ed] out that . . . [what is] unusual here is that while we had a date last insured that is in 2012, [the plaintiff] has had the same primary care treaters since then[,]" and there are reports from APRN Alexander and Dr. Grise that address "restrictions that would keep [the plaintiff] from working at all."  (Tr. 100).  The problem here is that the ALJ did not consider the records of most of the treaters from 2012, and, as discussed below, erred in his treatment of APRN Alexander's and Dr. Grise's opinions.

The plaintiff's treatment history with Dr. Stephan Lange, a neurosurgeon, began years before the relevant period at issue in this case.  In August 2007, Dr. Lange performed a right-sided L4-5 laminectomy and discectomy on the plaintiff, which resulted in "substantial improvement" in the plaintiff's lower extremity pain.  (Tr. 451).   Additionally, Dr. Lange gave the plaintiff

injections in his right knee and left hip. (Tr. 451). A year later, in July 2008, an MRI of the plaintiff's cervical spine revealed several abnormalities, including moderate bilateral stenosis at two levels. (Tr. 498; see also Tr. 493-94 (April 2009 MRI with consistent results)).[5]

Two years later, in June 2010, the plaintiff began seeing Dr. Mastella for a hand injury that he suffered the day before. (Tr. 423-24). The ALJ's decision does not so much as reference Dr. Mastella. On June 9, 2010, Dr. Mastella performed surgery on the plaintiff's left hand to repair the "multiple nerve injuries" the plaintiff sustained. (Tr. 421-22). Eleven days later, Dr. Mastella noted the plaintiff's complaints of "moderate pain and severe stiffness . . . . Range of motion is very limited secondary to dystrophy at hand and shoulder." (Tr. 418). Dr. Mastella prescribed physical therapy (Tr. 418), and the plaintiff's pain escalated to "severe" as of August 23, 2010. (Tr. 417). The plaintiff underwent nerve conduct and EMG testing in late August 2010, which revealed bilateral carpal tunnel syndrome of a mild degree. (Tr. 331-23).

On October 6, 2010, Dr. Mastella concluded that the plaintiff had "RSD [Reflex Sympathetic Dystrophy] on the left side with frozen shoulder on the right" which he said was improving. (Tr. 414).[6] The plaintiff returned to Dr. Mastella on December 16, 2010 for complaints of decreased active motion of the post-surgical fingers on the left hand and bilateral frozen shoulder, with the right side worse than left. (Tr. 411-12). Dr. Mastella proposed "trigger release and carpal tunnel release." (Tr. 411-12). An MRI of the right shoulder on December 23, 2010 revealed abnormalities at the glenohumeral joint. (Tr. 325-26). On December 28, 2010, Dr.

---

[5] The plaintiff's history of back pain is evident also from June 2009 treatment notes from Dr. Robert Peppermann; at that time, the plaintiff's lumbar range of motion was limited, and he received a steroidal injection, with a repeat injection on July 30, 2009. (Tr. 318-20). His diagnoses were "[l]umbar post-laminectomy syndrome with overlying pain syndrome, and bilateral sacroiliac joint dysfunction." (Tr. 319).

[6] Reflex Sympathetic Dystrophy is known as Complex Regional Pain Syndrome, the symptoms of which include, *inter alia*, continuous burning or throbbing pain, joint stiffness, swelling and damage, muscle spasms, tremors weakness and atrophy, and decreased ability to move the affected body part. https://www.mayoclinic.org/diseases-conditions/complex-regional-pain-syndrome/symptoms-causes/syc-20371151 (last visited August 29, 2019).

Mastella injected the right shoulder, and on January 13, 2011, he injected the left shoulder. (Tr. 405, 410).

On January 3, 2011, Dr. Mastella performed tenolysis surgery on the left hand and a carpal tunnel release. (Tr. 407-09). The plaintiff experienced numbness and tingling which Dr. Mastella felt was related to the plaintiff's C7 neuropathy. (Tr. 404). By April 11, 2011, Dr. Mastella opined that the plaintiff had "done quite well" following the January 3, 2011 surgery. (Tr. 401).

The relevant medical records resume in early 2012, just months before the plaintiff's alleged onset date of disability. On January 31, 2012, Dr. John Mara evaluated the plaintiff for limitations in both shoulders. (Tr. 444-45). The ALJ's decision does not refer to Dr. Mara either. As of January 2012, the plaintiff had "significant limitation of motion at the right shoulder consistent with adhesive capsulitis. At the left shoulder there [was] less pronounced, but still significant loss of motion." (Tr. 444-45). Dr. Mara administered steroid injections to both shoulders and ordered physical therapy. (Tr. 444-45).

On February 13, 2012, just prior to the plaintiff's alleged onset date of disability, Dr. Mastella issued a permanency rating for the plaintiff's left hand, in which he outlined the history of treatment for the injured hand: "He ha[d] significant difficulty with grasp, especially power grip. He [could not] turn anything very well and he ha[d] a hard time doing things. He [could not] feel money in his pocket due to sensory changes." (Tr. 398-99). He assigned a "permanent partial impairment of 25% of the left dominant hand" in accordance with the American Medical Association rating guidelines. (Tr. 399). Between March and June 2012, the plaintiff had "terrible pain" in his right shoulder that radiated down his arm. (Tr. 79). He could not lift overhead and had "problems" getting his jacket on. (Tr. 79). Dr. Mastella's records were consistent with the plaintiff's testimony that, at the time at issue in this social security claim, he had arthritis in his

right hand, and the surgeries on his left hand helped "as much as [they] possibly could[]" but he still did not have any feeling in the tips of three of his fingers, and he "ended up with carpal tunnel because of the fingers too." (Tr. 61-62).

At a follow-up visit on February 20, 2012, Dr. Mara noted that the plaintiff's "left shoulder [was] doing much better although, he [could] only bring the arm to about L3. The right shoulder continue[d] to show significant stiffness and pain beyond 80[ degrees]." (Tr. 443). Dr. Mara noted that, if additional physical therapy was unsuccessful, an arthroscopic procedure for lysis and manipulation was to be considered. (Tr. 443). The physical therapy was unsuccessful; thus, on March 1, 2012, Dr. Mara performed "an arthroscopy, lysis of adhesions, subacromial decompression and manipulation." (Tr. 439-40). As of March 8, 2012, the plaintiff was going to physical therapy three times a week, and he was "neurovascularly intact." (Tr. 442).

On March 16, 2012, Dr. Mastella performed a "stenosing tenosynovitis release" of the small finger on the plaintiff's left hand. (Tr. 396-97). He opined that the plaintiff was totally disabled from that date until further notice. (Tr. 426).

On April 9, 2012, Dr. Mara noted that the plaintiff's "range of motion [was] excellent in abduction, external rotation and forward flexion, but still lacking behind the back to the level of S1." (Tr. 441). He recommended a stretching program. (Tr. 441).

Three days later, the plaintiff resumed treatment with Dr. Lange for pain associated with his low back and neck issues. Carolyn Solak, PA, who was affiliated with Dr. Lange, saw the plaintiff on April 12, 2012 for his lower back pain. (Tr. 527-28). The plaintiff reported that when he stood for longer than five minutes, he would have "radiating pain of [the] right lateral thigh[,] burning and pain." (Tr. 527). Additionally, he had pain "traveling from the side of his hip and the lumbar spine region[,]" and would occasionally experience "pain down the posterior aspect of the

right left if he [was] seated or lying down for any length of time." (Tr. 527). He reported that he rarely had symptoms on the left side. (Tr. 527). Straight leg raise testing was negative, and PA Solak ordered a lumbar MRI. A cervical, not lumbar, MRI was performed on April 17, 2012; it showed no significant changes from a December 10, 2009 cervical MRI. (Tr. 469-70).

The plaintiff saw Dr. Lange on April 26, 2012 for "ongoing neck and radiating right arm pain." (Tr. 523-24). The plaintiff had limited range of motion in his cervical spine, and Dr. Lange noted that neck extension and flexion appeared to cause pain. (Tr. 524). Dr. Lange's note reflected that the plaintiff's pain "with its numbness and weakness ha[d] not improved despite conservative care. The patient remain[ed] significantly hampered in his daily activities." (Tr. 523). Dr. Lange stated that the cervical MRI "demonstrated degenerative disc with foraminal stenosis at C4-5 and C5-6[,]" and neck pain, stiffness, and swelling were noted, along with numbness, paresthesias and weakness. (Tr. 523). The plaintiff had a BMI of 37.66. (Tr. 523).[7] The plaintiff's testimony was consistent with Dr. Lange's records. He testified that, during the relevant time, he could not carry anything, he had trouble sleeping because of pain when he turned, and he had pain bending, stooping, kneeling and crouching. (Tr. 59). Dr. Lange recommended "an anterior cervical discectomy, fusion and instrumentation at C4-5 and C5-6." (Tr. 524). The next day, Dr. Mastella referred the plaintiff for "therapy for evaluation and treatment as indicated[]" for his left hand. (Tr. 395). Dr. Mastella opined that the plaintiff may return to regular duty work without restriction. (Tr. 425).

---

[7] The ALJ noted in his decision that, in 2015, the plaintiff's rheumatologist reported the plaintiff's BMI was 23.1 "which meant that his weight was normal." (Tr. 24). Additionally, he noted that, in 2017, Dr. Lange's record reflected that the plaintiff's BMI was 37. (Tr. 24). The parties agree that the BMI of 23 was a typographical error in the medical record, but they disagree as to the import of the ALJ's reference to this BMI in his decision, and his notation that this was a "normal" weight.

The plaintiff consulted Dr. Gerald J. Becker, an orthopedist, on May 31, 2012 (Tr. 725-26), whose findings were consistent with Dr. Lange's. Dr. Becker noted that, upon examination, the plaintiff's "paracervical muscles [were] fairly tight. Range of motion [was] reduced by 80% of extension, 30% of rotation, and 15% of flexion" with normal motor strength. (Tr. 725-26). Dr. Becker opined that the plaintiff had "ongoing neck pain as the result of degenerative disc disease at C4-5 and C5-6 with significant foraminal stenosis." (Tr. 725). Consistent with Dr. Lange's assessment, Dr. Becker opined that the plaintiff was an "appropriate candidate" for surgery. (Tr. 726).

The plaintiff returned to Dr. Mara on June 11, 2012 for a follow-up for his right shoulder. (Tr. 433). The plaintiff had "numbness and tingling radiating from the neck down the arm." (Tr. 433). Dr. Mara noted that the plaintiff's right shoulder abduction, internal and external rotation were all "much improved" following the March 1, 2012 surgery. (Tr. 433). Dr. Mara noted that, during the surgery, he did "see some osteoarthritic changes at the inferior aspect of the glenoid so it [was] expected that there [would] be some limitation of motion over the norm because of that." (Tr. 433).

On June 13, 2012, just weeks before the plaintiff's date last insured, Dr. Lange and Dr. Becker performed an anterior discectomy, arthrodesis, and fusion, C4-5 and C5-6 with bone graft and application of a titanium plate. (Tr. 555-57). A post-surgical x-ray taken on June 19, 2012, revealed "significant preveterbral swelling"; an MRI was recommended and done that day. (Tr. 466). The MRI revealed mild foraminal narrowing at C2-C3; a "minor disc bulge" and moderate foraminal narrowing by encroaching disc at C3-C4; post-operative changes at C4-C5 and C5-C6, at both levels mild residual canal narrowing and mild to moderate bilateral foraminal narrowing. (Tr. 464-65).

The plaintiff saw Dr. Lange on June 26, 2012 for a follow up. (Tr. 515-16). Dr. Lange noted that the plaintiff had been admitted to the hospital post-operatively "for some swallowing difficulty and swelling"; he was given steroids, but Dr. Lange discontinued that treatment as he was "concerned that [it would] hamper his fusion if continued." (Tr. 515-16). He prescribed physical therapy for the plaintiff's "intrascapular pain." (Tr. 516). As stated above, the plaintiff's date last insured was four days later, June 30, 2012.

The plaintiff is correct that, despite the consistent treatment from each of these doctors during this relevant period, and despite the fact that the Dr. Lange and Dr. Becker operated on the plaintiff within this relevant period, the ALJ did not have a function-by-function assessment from any of these treating physicians explaining what the plaintiff could and could not do with respect to his cervical spine, hand, or shoulder impairments.

In his decision, the ALJ discussed the 2012 and 2017 treatment records from Dr. Lange (Tr. 22-24); an April 2013 treatment record from Dr. Grise (Tr. 23); the treatment records from Dr. Melinda Ramsby, a rheumatologist, from December 2013 and October 2015 (Tr. 23-24); treatment notes from Dr. Christine Vigneault, a nephrologist, from July 2014 (Tr. 23); treatment notes from Dr. Joe Silver, a hematologist and oncologist, from March 2015 (Tr. 23); treatment records for lower back pain from Dr. Raymond Squier, an anesthesiologist, from April and September 2016 (Tr. 24); and, treatment records from Dr. Robert W. McAllister, an orthopedic surgeon from May 2017 (Tr. 25). Additionally, he considered the opinion evidence from State agency doctors, Kurshid Khan and Jeanne Kuslis from 2016 (Tr. 26); a treating source statement from Dr. Grise that the ALJ stated was "completed in December 2016" (Tr. 26)[8]; and a physical residual functional capacity report from October 2017 from APRN Nanette Alexander. (Tr. 26).

---

[8] As discussed below, this statement is dated December 2012. (Tr. 530-31).

With the exception of Dr. Lange's 2012 treatment records, none of the records addressed by the ALJ reflect the contemporaneous treatment of the plaintiff during the period relevant to his application for benefits. Additionally, the ALJ rejected Dr. Lange's contemporaneous treatment records in favor of records that post-date the relevant time period at issue. Although there are several treatment records pre-dating, and within the range of the plaintiff's covered period of alleged disability, the ALJ did not have the benefit of Dr. Lange's opinion as to the plaintiff's RFC in light of his back impairment, nor did he have Dr. Mastella's opinion as to the plaintiff's RFC in light of his hand impairment, or Dr. Mara's opinion as to the plaintiff's RFC in light of his shoulder impairment; indeed, the ALJ did not even reference Dr. Mastella's or Dr. Mara's records. *See Prince v. Berryhill*, 304 F. Supp. 2d 281, 288-89 (D. Conn. 2018) (holding that the ALJ could not ascertain the claimant's limitations without views from the treating physician as to the claimant's RFC in light of her impairments).

It is well established that "the SSA recognizes the 'treating physician' rule of deference to the views of the physician who has engaged in the primary treatment of the claimant." *Burgess*, 537 F.3d at 128 (quoting *Green-Younger v. Barnhart*, 335 F.3d 99, 106 (2d Cir. 2003)). Consequently, "the expert opinions of a treating physician are of particular importance to a disability determination." *Prince*, 304 F. Supp. 3d at 288 (citing *Hallet v. Astrue*, No. 3:11 CV 1181 (VLB), 2012 WL 4371241, at *6 (D. Conn. Sept. 24, 2012) (concluding that "[b]ecause the expert opinions of a treating physician as to the existence of disability are binding on the factfinder, it is not sufficient for the ALJ simply to secure raw data from the treating physician" and remanding for further development of the record).

Although the plaintiff is correct that there is no medical source statement of the plaintiff's functional limitations from Dr. Grise, the plaintiff's treating physician prior to, and after, the period

from his amended onset date of disability to his date last insured (Pl.'s Mem. at 3), there is a statement from Dr. Grise later in 2012. (Tr. 530-34). Specifically, on December 2, 2012, Dr. Grise, the plaintiff's treating physician, provided a statement in connection with a jury summons that the plaintiff received in 2012, in which he indicated that the plaintiff was "very disabled and [Dr. Grise did] not feel [the plaintiff] could remain in a stationary position for more than 10-15 minutes. [The plaintiff] [was] an insulin dependent diabetic, [with] sleep apnea, [illegible,] cervical disc disease [and] cervical radiculopathy, degenerative disc [disease with] spinal stenosis [and] sciatica." (Tr. 530-31). He added that the plaintiff "[was] in chronic pain and [could not] be immobilized for any length of time[.]" (Tr. 531).[9] Although the ultimate issue of disability is a decision reserved to the Commissioner, 20 C.F.R. § 404.1527(d)(1), the portion of Dr. Grise's statement regarding the plaintiff's limitations bears directly on the plaintiff's functional limitations, none of which were addressed by the ALJ in his decision. Moreover, in his decision, the ALJ first states that Dr. Grise completed a treating source statement on December 2, 2012, but then states that he assigned it "little weight, as it was inconsistent with the medical record and it was provided on *December 22, 2016, long after the claimant's date last insured*." (Tr. 26). This conclusion by the ALJ is clearly erroneous.

In addition to erring in his treatment of Dr. Grise's statement, the ALJ erred in his assessment of the one medical source statement in the record — a statement from APRN Alexander. On October 16, 2017, APRN Nanette Alexander completed a medical source statement in which she recited the plaintiff's history of "chronic pain" which was not alleviated by previous surgeries. (Tr. 1405). She noted that, due to right ulnar surgery and left shoulder surgery, the

---

[9] The plaintiff argues that, although he was treated by Dr. Grise prior to, and after, the period from his amended date of disability and his date last insured, there is no medical source statement from Dr. Grise, even if it was retrospective. (Pl.'s Mem. at 3). The ALJ, however, did request such statement from Dr. Grise on February 11, 2016, and Dr. Grise did not comply with the request. (Tr. 620).

latter of which caused "permanent loss of strength[,]" the plaintiff was unable to lift, twist, stoop, crouch or climb. (Tr. 1406). Additionally, he could not sit for more than one hour and could stand for only fifteen minutes. (Tr. 1407). According to APRN Alexander, the plaintiff needed regular breaks due to muscle weakness, chronic fatigue, pain, and adverse effects from medication, and his polyneuropathy in his hands and feet, chronic neck pain, and lumbar pain since 2012 "continue[d] to impact his daily functioning." (Tr. 1408). APRN Alexander concluded that the plaintiff would be off task 20 percent of his day and would be absent from work more than four days per month due to his impairments. (*Id.*).

While it was within the ALJ's province to assign partial or limited weight to the opinion of an APRN as an APRN is not an "acceptable medical source" whose opinion would be entitled to controlling weight, 20 C.F.R. § 404.1527(a)(2), the ALJ did not reject this opinion on that basis. Rather, the ALJ concluded that APRN Alexander's opinion was entitled to "little weight" because: (1) she stopped treating the plaintiff before the amended onset date, and (2) the opinion was "generally inconsistent with the medical evidence of record as the claimant was consistently alert, cooperative, fully oriented, well nourished, well developed, normal appearing, well hydrated, and in no acute distress." (Tr. 26).

As an initial matter, the record does not support the ALJ's conclusion about the plaintiff's treatment history. The record includes treatment notes from APRN Alexander on September 12 (Tr. 1137-41) and October 28, 2014 (Tr. 1150-52), February 3, 2015 (Tr. 1147-49), July 14 (Tr. 996-1000), September 14 (Tr. 994-95), October 21, 2016 (Tr. 991-93), January 25 (Tr. 1390-96), May 21 (Tr. 1381-89), and August 3, 2017 (Tr. 1374-80). Also, the APRN's statement refers to the time period at issue, and thus, is of particular importance in this case.

Second, although the ALJ stated that the opinion was "inconsistent with the medical record" because the plaintiff was "consistently alert, cooperative, fully oriented, well nourished, well developed, normal appearing, well hydrated, and in no acute distress," (Tr. 26), it is not clear how any of these references are probative of APRN Alexander's opinions about the plaintiff's pain and functional limitations. *See Greek v. Colvin*, 802 F.3d 370, 375 (2d Cir. 2015) (holding that an ALJ must "comprehensively set[s] forth [his] reasons" for assigning partial weight to a treating source opinion). Accordingly, the ALJ has failed to set forth "good reasons" for rejecting this opinion. *See Burgess*, 537 F.3d at 129-30

With errors in the ALJ's assessment of Dr. Grise's statement, a failure to provide "comprehensive" and "good reasons" for assigning partial weight to the only medical source statement in the record, and a failure to secure medical statements regarding the plaintiff's functional limitations, the ALJ did not base his decision on a complete record. The ALJ lacked a medical source statement for the relevant time period from which he could determine what the plaintiff "could do despite [his] impairment(s)." *Tankisi v. Comm'r of Soc. Sec.*, 521 F. App'x 29, 33 (2d Cir. 2013) (quoting 20 C.F.R. § 404.1513(b)(6) (additional citation omitted)) (holding that the SSA's regulations provide that the Social Security Administration "will request a medical source statement about what you can still do despite your impairment(s).") The Second Circuit has explained that the "plain text [in section 404.1513(b)(6)] . . . does not appear to be conditional or hortatory: it states that the Commissioner '*will* request a medical source statement' containing an opinion regarding the claimant's residual capacity. The regulation thus seems to impose on the ALJ a duty to solicit such medical opinions." *Id.* (quoting 20 C.F.R. § 404.1513(b)(6) (additional citation omitted) (emphasis in original)).[10]

---

[10] *See also* 20 C.F.R. § 404.1520b (now providing that an ALJ may, but is not obligated to recontact a treating physician, and providing for such measures only when the existing record evidence is inconsistent or insufficient to

"The need to obtain medical source statements from a claimant's treating physicians is particularly acute, because SSA regulations give the opinions of treating physicians 'controlling weight,' so long as those opinions are 'well-supported by medically acceptable clinical and laboratory diagnostic techniques and [are] not inconsistent with the other substantial evidence in . . . [the] record.'" *DeLeon v. Colvin*, No. 15 CV 1106 (JCH), 2016 WL 3211419, at *3 (D. Conn. June 9, 2016) (quoting 20 C.F.R. § 416.927(c)(2) (additional citation omitted)). The regulations provide that the medical reports "'*should* include . . . [a] statement about you can still do despite your impairment,' not that they *must* include such statements." *Tankisi*, 521 F. App'x at 33 (quoting 20 C.F.R. §§ 404.1513(b)(6), 416.913(b)(6) (emphasis added)). However, as the Second Circuit also acknowledges, the regulations state that "'the lack of the medical source statement will not make the report incomplete.'" *Id.* (quoting 20 C.F.R. § 404.1513(b)(6)) (additional citation omitted); *see Swiantek v. Comm'r Soc. Sec.*, 588 F. App'x 82, 84 (2d Cir. 2015) (summary order) ("Although the Social Security regulations express a clear preference for evidence form the claimant's own treating physician over the opinion rendered by the consultative examiner . . . , this Court does not always treat the absence of a medical source statement from claimant's treating physicians as fatal to the ALJ's determination."). Thus, the regulations, "[t]aken more broadly, . . . suggest remand is not always required when an ALJ fails in his duty to request opinions, particularly where . . . the record contains sufficient evidence from which an ALJ can assess the [claimant's] residual functional capacity." *Tankisi*, 521 F. App'x at 34; *see also Downes*, 2015 WL 4481088, at *15 (holding that remand is not necessary when the record contains

---

make a disability determination); *see* 77 Fed. Reg 10, 651-01 (promulgating new regulations, effective March 26, 2012, amended 20 C.F.R. § 404.1512 to remove former subsection (e)). "While this amendment has given the ALJ greater flexibility in determining how to obtain additional information, it has not eliminated the ALJ's obligation to develop the record when additional information is needed due to the vagueness, incompleteness, or inconsistency of the treating source's opinion." *Moreau v. Berryhill*, No. 3:17 CV 396(JCH), 2018 WL 1316197, at *11 n.6 (D. Conn. Mar. 14, 2018) (multiple citations omitted).

sufficient information from which the ALJ can assess a claimant's RFC, and when the record contains as assessment of a claimant's limitations from at least one treating physician) (citing *Tankisi*, 521 F. App'x at 34); *see Perez*, 77 F.3d at 47-48.

In this case, given that the ALJ considered almost none of the records from the relevant covered period of alleged disability, erred in his assessment of the only medical statement from a treating physician, and failed to provide good reasons for rejecting the only functional assessment in the record, the Court concludes that the ALJ did not, and could not, reach an "informed decision based on the record[.]" *Sanchez v. Colvin*, No. 13 Civ. 6303 (PAE), 2015 WL 736102, at *5 (S.D.N.Y. Feb. 20, 2015) (holding that the issue as to whether a treating physician's opinion is necessary "focuses on circumstance of the particular case, the comprehensiveness of the administrative record, and, at core, whether an ALJ could reach an informed decision based on the record[.]"); *see also DeLeon*, 2016 WL 3211419, at *4 (concluding that "assessing whether it was legal error for an ALJ to fail to request a medical source statement from a claimant's treating physician is a case-specific inquiry."). The ALJ concluded that the plaintiff retained the RFC to perform light work,[11] except he could occasionally reach overhead with his right dominant arm and could occasionally finger items with his left hand, and he could frequently climb ramps and stairs, balance, kneel, and crouch, and occasionally crawl and climb ladders, ropes and scaffolds. (Tr. 21). Although the record before the ALJ is voluminous, the record contains "'neither a formal nor an informal RFC assessment by a treating physician on which the ALJ could have relied in

---

[11] Light work as defined by 20 C.F.R. § 404.1567(b) involves lifting no more than 20 pounds at a time with frequent lifting or carrying of objects weighing up to 10 pounds. Additionally, light work requires "a good deal of walking or standing," or it involves sitting most of the time with some pushing and pulling of arm or leg controls. 20 C.F.R. § 404.1567(b). "To be considered capable of performing a full or wide range of light work, you must have the ability to do substantially all of these activities." *Id.*

making an RFC determination"' reflective of the plaintiff's limitations during the limited, relevant time period at issue. *Alamo v. Berryhill*, No. 3:18 CV 210 (JCH), 2019 WL 4164759, at *6 (D. Conn. Sept. 3, 2019) (quoting *Moreau*, 2018 WL 1316197, at *8). Accordingly, under the facts of this case, and in light of the absence of evidence from which the ALJ could assess the plaintiff's RFC, a remand is required.

B.    REMAINING ARGUMENTS

The plaintiff argues also that the ALJ erred in his treatment of the plaintiff's claims of disabling pain (Pl.'s Mem. at 9-12), and the ALJ's consideration of the evidence was flawed in that he relied on entries from the record outside of the relevant period at issue and "cherry pick[ed]" the record. (Pl.'s Mem. at 12-16). In addition, the plaintiff contends that the ALJ's step four findings were insufficient because they were based on the vocational expert's answers to hypothetical questions that lacked support in the record. (Pl.'s Mem. at 16-24). Upon remand, after considering the plaintiff's functional limitations as described by the providers who treated the plaintiff during the relevant period at issue, the ALJ shall consider the plaintiff's complaints of pain, and, if necessary, shall reach a finding at step four supported by all of the medical evidence in the record, including the plaintiff's obesity.[12] Accordingly, in light of the Court's conclusion in Section V.A. *supra*, the Court need not address these arguments further.

VI.    CONCLUSION

For the reasons stated below, the plaintiff's Motion to Reverse the Decision of the Commissioner (Doc. No. 11) is GRANTED such that this case is remanded for further development of the record to include statements of the plaintiff's functional limitations from treating providers regarding the relevant period at issue, reweighing of the evidence in light of this

---

[12] *See* note 7 *supra*.

new information, a *de novo* hearing before an ALJ, and a new decision. The defendant's Motion to Affirm (Doc. No. 12) is DENIED.

This is not a recommended ruling. The consent of the parties allows this magistrate judge to direct the entry of a judgment of the district court in accordance with the Federal Rules of Civil Procedure. Appeals can be made directly to the appropriate United States Court of Appeals from this judgment. *See* 28 U.S.C. § 636(c)(3); FED. R. CIV. P. 73(c). The Clerk's Office is instructed that, if any party appeals to this Court the decision made after this remand, any subsequent social security appeal is to be assigned to the Magistrate Judge who issued the Ruling that remanded the case.

Dated this 20th day of September, 2019 at New Haven, Connecticut.

  /s/Robert M. Spector, USMJ
Robert M. Spector
United States Magistrate Judge